Filed 12/10/15  In re A.K. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re A.K. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E063591 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J251174, J251175 & J251176) |
| v. | OPINION |
| A.J. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant A.J.

Sharon S. Rollo, under appointment by the Court of Appeal, for Defendant and Appellant T.K.

1

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County

Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

T.K. (mother) and A.J. (father; collectively, parents) appeal an order terminating

their parental rights under Welfare and Institutions Code, section 366.26[1] to their

daughter A.J. (born in 2003) and two sons, A.J.J. (born in 2006) and A.K. (born in 2012).

Mother contends the juvenile court erred in summarily denying her section 388 petition

without a hearing. Father contends the juvenile court erred in rejecting the beneficial

parent relationship exception to terminating parental rights (§ 366.26, subd. (c)(1)(B)(i)).

Father also argues the juvenile court erred in failing to consider that termination of

parental rights might lead to separation of the siblings. To the extent applicable, mother

joins in father's arguments on appeal.

For the reasons stated below, we reject parents' contentions and affirm the

judgment.[2]

---

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

[2] Father has also filed in this case a petition for writ of habeas corpus (case No. E064062), in which he alleges he was denied effective assistance of counsel in the juvenile court. By separate order, we have denied father's writ petition. We conclude father has not met his burden of establishing that his trial attorney's representation fell below prevailing professional norms or he was prejudiced.

2

II

FACTS AND PROCEDURAL BACKGROUND

San Bernardino County Children and Family Services (CFS) received referrals on August 29, 2013, and September 4, 2013, alleging mother had physically abused A.J., A.J.J., and A.K. (the children) and father had generally neglected them. The social worker interviewed A.J. and A.J.J. at their school. A.J. reported that the previous day mother got angry at her because mother thought A.J. was hurting their dog. Mother grabbed A.J. by her arms and held her to the floor, hit A.J. with an open hand, and then ordered her to walk alone to A.J.'s older sister's house, a block away. A.J. was scared because it was late and dark outside. A.J. told the social worker mother disciplined her that way when she argued with mother. Mother also would spank her with an open hand and "pop" her in the mouth with an open hand. A.J. said she was afraid of mother and would rather stay with her two adult half-sisters, where she felt safe. A.J. reported she overheard one of her older sisters discussing A.K.'s black eye.

The social worker interviewed A.J.J., who reported his parents disciplined him by being "'spanked or popped in the mouth.'" A.J.J. told the social worker that the previous evening his older, adult sister took him to her home. When his sister arrived at A.J.J.'s house, mother yelled at her, grabbed her by the chin, and pushed her while she was holding A.K. Mother grabbed A.K. out of the older sister's arms. This altercation scared A.J.J. A.J.J. said he wanted to stay with his older, adult sisters. A.J.J. said A.K. had two black eyes and asked the social worker if she could "help his parents to stop fighting." A.J.J. said that while father was at work painting curbs, mother slept at home. She slept

3

so deeply sometimes that A.J.J. thought she was dead. She would not wake up when A.J. and A.J.J. tried waking her up. A.J.J. whispered to the social worker not to tell CFS.

The social worker interviewed mother, who was holding A.K. A.K. had a bruise on his forehead above his right eye, which mother claimed A.J.J. caused when A.J.J. pulled a blanket out from under A.K. This caused A.K. to bump his head on the corner of the wall. Mother denied hitting A.J. on the eye but admitted she hit A.J. in the face. Mother said she had aimed for A.J.'s mouth but A.J. turned away and mother hit her on the cheek. Mother believed A.J. had behavioral issues and had tried to hurt their dog. Mother said she did not know what had caused A.J.'s bruises on her face.

The social worker created a safety plan for mother. Mother agreed to sign a declaration releasing the children temporarily to stay with father's adult daughters, AsJ and AuJ. Parents also agreed to participate in reunification services and signed a declaration relinquishing the children into temporary custody. AsJ's home was not approved for placement because it was too small to accommodate the three children. The children were therefore initially placed in foster care.

**Petition and Detention Hearing**

In September 2013, CFS filed a juvenile dependency petition as to the three children under section 366.26, subdivisions (a), (b), and (j), alleging serious physical abuse of A.J., failure to protect the children, and abuse of siblings A.J.J. and A.K. The petition alleged that on September 3, 2013, mother slapped A.J., causing bruising to A.J.'s right eye lid and redness and swelling under her left eye; the children had been exposed to parents' domestic violence; parents suffered from substance abuse; mother

4

had mental health issues; and during juvenile dependency proceedings in the State of Washington, the court found that mother had physically abused A.J. and had failed to reunify with her.

CFS reported in the detention report that, although A.J. reportedly did not reunify with mother in Washington, A.J. reunified with father in 2012, about six months before CFS filed the instant juvenile dependency case.[3] Mother had no known California criminal history. Father had an extensive criminal history between 1995 and 2003, including drug-related charges.

At the detention hearing in September 2013, mother admitted she had a one night stand with a man in Seattle, named Jason, who might be A.K.'s biological father. She had no other contact with him or information about him. Father initially filed a parentage statement denying he was A.K.'s father but withdrew the statement at the detention hearing so that he could preserve his relationship with A.K. The court ordered the children detained in a foster home, ordered parents to submit to drug testing that day, and authorized supervised visitation with A.K. and supervised visitation with A.J. and A.J.J. after parents completed an assessment by the Children's Assessment Center (CAC).

**Jurisdiction/Disposition Hearing**

CFS stated in the jurisdiction/disposition report that father was the presumed father of A.J. and A.J.J. He reportedly was not the biological father of A.K. but father

---

[3] CFS erroneously reported in the six-month status review report that the out-of-state juvenile dependency proceedings were in Washington D.C.

5

held A.K. out as his own child and had provided care and support for A.K. since his birth. Mother failed to reunify with the children in the previous juvenile dependency case in Washington and therefore should not have had the children in her care. Parents, however, moved to California, reunited, and moved in together in their current home. CFS recommended father receive reunification services but not mother.

Parents waived their rights at the jurisdiction/disposition hearing and submitted on the petition to jurisdiction and disposition. The court found father to be the presumed father of all three children, declared the children dependents of the court, ordered the children removed from parents' custody, and ordered reunification services for both parents. The court ordered supervised visitation for parents, once a week for two hours, as to all three children.

In December 2013, the court authorized an application for psychotropic medication for A.J. for hyperactivity, defiance, poor attention, and physical altercations.

**Six-Month Status Review Hearing**

CFS reported in its six-month status review report filed in May 2014, that the three children were living with their older, adult sister, AuJ. During the reporting period, mother and father both failed to drug test five times and did not attend outpatient treatment. Father tested positive for drugs on one occasion.

In May 2014, father told the social worker parents were homeless. He was staying in a tent behind his older daughter's home and parents might be breaking up. Mother was going to move to a hotel. Mother was pregnant. Mother received a referral for mental health services but failed to go. Parents did not have any monetary resources or stable

6

housing. When the social worker discussed recommending adoption for the children, father said he did not care if his daughter, AuJ, adopted or had guardianship of them, as long as the children stayed together. CFS reported that mother also had not engaged in substance abuse testing or treatment, as ordered by the court. Mother participated in therapy but family therapy was cancelled because of parents needing first to work through issues between each other.

Parents participated in supervised visitation once a week for two hours. Visitation at AuJ's home was moved to the CFS offices because of parents' negative behavior towards the caregivers. Visits between mother and A.J. were at times explosive. A.J. and A.J.J. were attending weekly therapy. A.J. was taking psychotropic medications for Attention Deficit and Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder. A.K. was referred to Inland Regional Center (IRC). He would get upset and hit his head on the floor or wall. This frequently occurred after visits with parents. CFS recommended terminating reunification services and setting a section 366.26 hearing, with adoption as the recommended permanent plan. A.K. and A.J.J. had been living with AuJ since December 4, 2013. A.J. was initially placed with her paternal grandmother on December 4, 2013, and moved to AuJ's home on May 15, 2014. The children were doing well in their placement, and AuJ and her husband wanted to adopt them.

At the six-month review hearing in June 2014, CFS requested the court to suspend visitation because of A.K.'s negative behavior after visits. The court ordered parents to visit separately, as requested by parents' attorneys, because it was unclear which parent A.K. was reacting to. Two and a half weeks later, at the visitation review hearing, CFS

7

reported that father's visits were appropriate but mother was "'High on Meth'" when she arrived for her last visit. After the visit, A.K. hit, screamed, and disobeyed. The court ordered that the children not be forced to attend visits and continued separate visitation. The court also ordered mother to test for drugs that day. She tested positive for amphetamines.

CFS reported in July 2014, that mother had attended group services at Inland Valley Recovery Services (IVRS). She tested positive for drugs on July 13, 2014, and twice failed to test for drugs. Father completed a domestic violence prevention program and 12-session parenting program. Father tested positive for drugs in February and March 2014, and failed to show for random testing several other times. In July 2014, he enrolled in a 91-day substance abuse treatment program, with a projected completion date of September 30, 2014. Father also attended 12 therapy sessions between January 2013 and April 2014. Parents had moved out of their tent in AsJ's backyard and were living in a car. Parents' visits were appropriate but A.K.'s behavior continued to worsen after visiting with parents. CFS recommended terminating reunification services.

At the contested six-month review hearing on July 16, 2014, CFS changed its recommendation to continuing reunification services for father. The court found mother had made no progress and had recently tested positive for drugs. The court therefore terminated mother's reunification services but continued services for father. The court ordered separate visitation to continue for parents, with visitation for mother once a week, for one hour, and visitation for father once a week, for two hours. Because A.K.'s

8

behavior continued to worsen after mother's visits, the court found mother's visits with A.K. detrimental and suspended them.

At a nonappearance visitation hearing in September 2014, the court indicated that mother was homeless but continued to visit A.J.J. once a week. A.J. said she wanted to resume visiting with mother. A.K.'s behavior had improved since visits with mother had stopped. The caretaker believed mother's visits would negatively impact A.K. CFS recommended mother only visit A.J. and A.J.J. and the visits be closely monitored. The court ordered visitation between A.K. and mother remain suspended. The court ordered supervised visitation between mother and A.J. and A.J.J. take place at the CFS office for one hour, twice a month.

**Twelve-Month Status Review Hearing**

CFS reported in its 12-month status review hearing report filed in October 2014, that father claimed he was on the verge of completing an IVRS substance abuse treatment program. Father, however, refused to consent to release to CFS information regarding his drug treatment. Father had four therapy sessions. He had not demonstrated sobriety. He had positive drug test results and several "no shows." His visits with the children had been difficult. A.J. wrote mother a letter in September 2014, stating she wanted to remain in foster care with AuJ and her husband, but still wanted visits with parents.

Father admitted to "several decades" of substance abuse. He had been sober currently for only two months. Father's therapist recommended he continue therapy because of the short duration of his treatment and sobriety, and the complexity of his issues. In September 2014, staff at IVRS stated concerns about father's sobriety and

9

recommended he continue in the program because he had not remained sober. It appeared he had traded methamphetamines for prescription drugs. Father had three positive drug tests and three no-shows between July and October 2014.

Parents married in September 2014. As of October 2014, mother was about 10 months pregnant. Father believed the child might be his. Mother said she and father continued to have a problematic relationship even though they recently married. CFS observed parents having verbal altercations. Mother had accused father of not being truly sober. A.J. exhibited some behavioral and emotional problems but had much improved, with intensive services, including therapy and psychiatric evaluations. A.J.J. also received services, including therapy to address depressive symptoms when mother's visits resumed. A.J.J. was doing better. A.K. vacillated between being easy going and calm tempered, and having an explosive temper.

Since mid July 2014, father had supervised visits once a week for two hours. Father provided CFS with certificates of completion of drug treatment at IVRS, a parenting course in 2014, completion of substance abuse treatment in 2012, completion of five parenting courses between 2010 and 2011, and completion of a job-seeking program in 2008. He also provided documents showing attendance at therapy sessions, Narcotics Anonymous (NA), and anger management classes. CFS reported that despite receiving these services, father had not demonstrated he had benefited from these services. Father continued to struggle to maintain sobriety and continued to inappropriately discipline the children. In addition, in October 2014, father refused to

consent to necessary therapy for A.J.J., and did not have stable employment or adequate housing and income.

CFS recommended in its December 2014 addendum report that the court terminate father's reunification services and set a section 366.26 hearing, with a recommended permanent plan of adoption. CFS reported that on November 14, 2014, father "popped" A.J.J. in the mouth at the end of a supervised visit in response to A.J. and A.J.J. teasing father. CFS was also concerned about father's ongoing use of pain medications. In addition, father had tested positive for drugs in October and November 2014. CFS stated that father exhibited aggressive behaviors, had not benefited from reunification services, and had demonstrated poor impulse control. He was easily annoyed and very defensive.

At the 12-month status review hearing on December 11, 2014, father denied he hit A.J.J. in the mouth in anger during a visit. Father explained that he put his hand on A.J.J.'s mouth to silence him because father was trying to hear the person who was signing him out for visitation. When father put his hand to A.J.J.'s mouth, A.J.J. said, "What?" and father said, "I am trying to hear the lady." A.J.J. then stopped yelling.

Father testified he had participated in a parenting course, attended 12 sessions of individual counseling, attended a 12-session anger management program, and completed a 12-week outpatient program. Father intended on continuing to attend NA and AA meetings but was no longer participating in counseling. The CFS social worker testified father's therapist recently told her that father's therapy was terminated because father repeatedly gave excuses for not attending therapy. Father believed he had completed his plan, although he had not enrolled in an aftercare substance abuse program because he

11

was providing round-the clock care of his mother. Since October 2014, father had been living with his mother and employed as her caretaker seven days a week, 24 hours a day. She had cancer.

Father was married to mother. He was proud of her for graduating the past week from IVRS substance abuse programs. Father said he had been suffering from a painful torn rotator cuff injury and was going to undergo surgery for it in January or February 2015. Father took prescribed medication for the pain. He was taking Xanax and Seroquel for stress but was trying to reduce consumption of these drugs, and was currently only taking Seroquel. He had also taken hydrocodone, Percocet, and OxyContin for his arm pain. Father tested positive for opiates and benzodiazepine.

The court found father had made no progress in receiving more frequent visitation and visits remained supervised. Father continued to discipline the children by spanking and hitting them in the mouth. The court concluded that even assuming father had remained sober recently, it was only for a short period of time and he had not completed aftercare. Because father's progress had been minimal, the court terminated his reunification services and set a section 366.26 hearing. The court authorized supervised visitation for both parents twice a month for two hours, with the exception that mother's visitation with A.K. remained suspended.

On December 11, 2014, father filed a notice of intent to file a writ petition challenging the order of December 11, 2014, terminating his reunification services and setting a section 366.26 hearing (case No. E062480). This court dismissed father's writ

12

petition in February 2015, upon his attorney's request for dismissal based upon there being no justiciable issues of merit.

**Mother's section 388 Petition**

In April 2015, mother filed a section 388 petition, seeking to modify the order of June 3, 2014, terminating her reunification services. The record shows the court terminated mother's reunification services on July 16, 2014, not June 3, 2014. In her section 388 petition, mother requested custody of the children or, alternatively, reinstatement of reunification services. Mother alleged she had addressed the issues that led to the children's removal. Mother attached certificates of completion dated December 2014, of a 12-hour parenting class; an IVRS alcohol and drug outpatient treatment program; and a 12-hour anger management program. Mother also provided documents showing she had completed one out of 12 sessions of a parenting education course, and was currently participating in ongoing IVRC individual counseling. Mother began therapy in September 2014, and had attended nine sessions. Mother had enrolled in an IVRC aftercare program on December 23, 2014, and had attended 6 out of 16 sessions.

Mother stated in her section 388 petition that it would be in the children's best interests to grant the petition because her children remained bonded to her, knew her, and loved her. Mother continued to visit them consistently and the children enjoyed her visits.

13

The juvenile court summarily denied mother's section 388 petition on the grounds it did not state new evidence or a change of circumstances, and granting the petition would not promote the best interests of the children.

**Section 366.26 Hearing**

CFS reported in its section 366.26 hearing report that A.J. was taking medication for ADHD and doing really well in school. She exhibited some behavioral and emotional concerns but had improved. A.J. participated in therapy and psychiatric evaluations and had completed a Wraparound program. A.J.J.'s teachers were arranging for an Individualized Education Plan (IEP) for him because he appeared to have developmental delays. A.J.J. was participating in individual therapy to address depressive symptoms, usually surfacing when mother visited him. He was currently doing better. During the past eight months, A.K. had been attending individual therapy and parent child interactive therapy with his caretaker to assist A.K. with behavioral issues, including an explosive temper.

The children were attached to their prospective adoptive parents, AuJ and her husband, who were also very attached to the children and loved them as their own. AuJ and her husband had two of their own children who lived with them, and cared for the children's three-month-old brother, who had also been detained by the court in a separate case. A.J. and A.J.J. indicated they were happy AuJ wanted to adopt them. The children have lived with AuJ since December 4, 2013, and AuJ has known them since birth. A.J. viewed AuJ and her husband as her parents. AuJ and her husband were willing to allow the children to maintain a relationship with parents as long as visits were supervised and

14

appropriate. AuJ acknowledged her concern, however, regarding A.K.'s history of violent and aggressive behavior. Parents continued to participate in closely supervised visitation with the children. CFS recommended terminating parental rights and placing the children with their prospective adoptive parents.

At the contested section 366.26 hearing on May 16, 2015, A.J. was almost 12 years old, A.J.J. was eight, and A.K. was two years old. During the hearing, father testified he visited the children every week until the court terminated his reunification services in December 2014. He currently had supervised visitation with them every other week for two hours a week. He nevertheless believed he held a parental role. The children were happy to see him, gave him a hug, and called him "Dad." When the visits ended, the children would tell him they loved him. At the last visit, A.J. told father she could not wait until she could go home with him. While living with AuJ, A.J. used to contact father daily on her cell phone but this ended when, during a visit, father took her phone away for disciplinary reasons.

Father conceded AuJ had been parenting the children for a year and a half, and the children went to her when hurt or when they had a problem. A.J.J. and A.K. had lived with mother continuously until they were removed from her custody in September 2013. A.J. was out of her custody once before, for three years between the ages of six and nine years. Mother resumed parenting A.J. when father brought her from Washington in May 2013. Father requested the court to order the least restrictive permanent plan of legal guardianship.

15

Mother testified her relationship with A.J. had improved. A.J. would demand mother's attention during visits. Mother was currently visiting A.J. and A.J.J. for only an hour, every other week. During visits, A.J. told mother about school and her friends. A.J. liked school but did not discuss her classes or teacher. Sometimes A.J. would ask mother for advice about school issues. The children told mother they loved her. They ate together, talked and sometimes played a game during visits. During the children's last visit, they privately told the social worker they wanted to go home with mother. Mother was agreeable with placing the children in a guardianship but did not want adoption, resulting in termination of her parental rights.

The social worker, Maria Madrigal, testified she was told by another social worker during a visit that the children wanted to talk with Madrigal. In a separate visitation room, A.J. told Madrigal she was upset with the person monitoring the visit because she was too stern. A.J. did not say she wanted to go home with mother. A.J. and the other children only expressed a desire to be adopted.

At the section 366.26 hearing, the parties stipulated to a statement by A.J., rather than requiring her to testify. A.J.'s stipulated statement stated that she enjoyed visiting with parents but wanted to stay with AuJ, whom A.J. considered her parent. A.J. wanted to be adopted by her because it was permanent and safe. A.K. would "throw a fit" if AuJ left the room, and A.K. had not visited with mother since before Christmas 2014.

The court found that, although parents visited the children regularly, there was no evidence that terminating parental rights would be detrimental to the children. The evidence indicated parents were semi-frequent visitors but their relationship with the

16

children did not fill a parental role to such a degree it outweighed the well-being of the children in gaining a permanent home through adoption.  In addition, A.J. and A.J.J. had requested adoption and permanency.  The court found the children were adoptable and the parental benefit exception to adoption did not apply.  The court ordered parental rights terminated, with adoption the children's permanent plan.

III

MOTHER'S SECTION 388 PETITION

Mother contends the juvenile court abused its discretion by summarily denying her section 388 petition.

*A.  Procedural Background*

On April 1, 2015, mother filed a section 388 petition, seeking to modify the order of July 16, 2014, terminating her reunification services.  Mother alleged she had addressed the issues leading to the children's removal.  Mother attached certificates of completion from December 2014, of a 12-hour parenting class; an IVRS alcohol and drug outpatient treatment program; and a 12-hour anger management program.  Mother also provided documents showing she had completed one out of 12 sessions of a parenting education course, and was currently participating in ongoing IVRC individual counseling.  Mother began therapy in September 2014, and had attended nine sessions.  Mother enrolled in an IVRC aftercare program in December 2014, and had attended six out of 16 sessions.  Mother also alleged in her section 388 petition that it would be in the children's best interests to grant her petition because the children remained bonded to her, knew her,

17

and loved her. Mother continued consistently to visit them and the children enjoyed her visits.

On April 3, 2015, the court summarily denied mother's section 388 petition on the grounds mother's section 388 petition did not provide new evidence or any evidence of a change of circumstances, and granting the petition would not promote the best interests of the children.

*B. Applicable Law*

Under section 388, a parent may petition the juvenile court to modify its previous orders upon the grounds of new evidence or changed circumstances. (§ 388, subd. (a).) The juvenile court may summarily deny a section 388 petition if the petition fails to make a prima facie showing either (1) of a change of circumstances or new evidence, or (2) that the requested change would promote the best interests of the child. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414.) A hearing "is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 807.) We review the summary denial of a section 388 petition for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460 (*Angel B.*).)

*C. No Prima Facie Showing of Changed Circumstances*

Mother urges that she made out a proper case for modifying the court's order of July 16, 2014, terminating her reunification services. She filed her petition in April 2015,

18

eight and a half months after the July 16, 2014, order. During that period, mother attended various courses and programs addressing her substance abuse, parenting, anger management, and relationship issues, but mother did not present any evidence of changed circumstances demonstrating that visitation with A.J. and A.J.J. no longer needed to be supervised, or that visitation with A.K. should be reinstated.

Mother had minimal visitation. At the July 16, 2014, hearing, the court reduced mother's visitation to one hour every other week and visits remained supervised for both parents. During this very limited visitation time, mother had not demonstrated she was able to implement the skills recently taught to her and appropriately parent the children. Visitation with A.K. was never reinstated and mother's visitation with A.J. and A.J.J. remained brief and closely supervised. A.J. had been removed once before. Furthermore mother's completion of substance abuse treatment was relatively recent.

There was also little, if any, evidence that mother's relationship with father had improved. Mother had not demonstrated she had resolved her relationship issues with father or that she had an independent source of income and was able to provide a stable home for the children. She recently moved in with father, who was living with his mother while employed as his mother's round-the-clock caregiver.

Mother argues that, had the juvenile court granted a hearing on her section 388 petition, rather than summarily dismissing it, she would have presented evidence demonstrating what she had learned from receiving multiple services and how she benefited from the services. But mother had the burden of, at a minimum, making a prima facie showing of changed circumstances and she did not meet this low threshold.

19

*D. No Prima Facie Showing of Best Interests of the Children*

Even if mother provided sufficient evidence of changed circumstances, she did not meet her burden of showing that granting her section 388 petition was in the children's best interests. Mother also did not make a prima facie showing that granting her section 388 petition and reinstating reunification services or returning the children to mother was in the children's best interests. "[I]f a parent makes a prima facie showing of a change of circumstance such that a proposed change in custody *might* be in the child's best interest, then the juvenile court *must* hold a hearing." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 461.) Whether mother made a prima facie showing entitling her to a hearing depends on the facts alleged in her petition, as well as undisputed facts established by the court's own file, such as the children's ages, the nature of their existing placement, and when the children became juvenile dependents. (*Ibid*.)

In *Angel B.*, *supra*, 97 Cal.App.4th 454, the court affirmed the trial court ruling denying the mother a hearing on her section 388 petition based on findings that the mother failed to make the requisite prima facie showing of changed circumstances and that the proposed change in custody was in the child's best interest. The *Angel B.* court reasoned that, "there was no evidence that Mother was ready to assume custody of Angel or provide suitable care for her; while she had completed the drug program, the time she had been sober was very brief compared to her many years of drug addiction (a concern expressed by the social worker), and in the past she had been unable to remain sober even when the stakes involved were the loss of her other child. Nor was there evidence that she had a housing situation suitable for Angel, or any arrangements for child care while

20

she worked. And . . . there was no evidence that Angel preferred to live with Mother rather than with the foster family." (*Angel B.*, at p. 463.)

Likewise, here, there was no evidence showing that granting mother's section 388 petition was in the children's best interests. There was no evidence that mother was ready to assume custody of the children or provide suitable care for them, particularly A.K.; while she had completed a drug program, the time she had been sober was very brief compared to her many years of drug addiction, and in the past she had been unable to remain sober even when the stakes involved were the loss of A.J. Nor was there evidence that mother had stable housing suitable for the children. There also was evidence that A.J. wanted to be adopted by AuJ, and A.J.J. was willing to be adopted by his prospective adoptive family. As to A.K., mother had not had visited with him for over eight months, since visitation was suspended in July 2014, and A.K. had been removed from parents when he was only 11 months old. A.K. had lived with his prospective adoptive parents for the majority of his life.

In addition, as explained in *Angel B.*, "a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. [Citation]. That need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.)

The court in *Angel B.* noted that the burden of proof "is a difficult burden to meet in many cases, and particularly so when, as here, reunification services have been

21

terminated or never ordered. After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability. [Citation.] In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child [citation]; such presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care. A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.)

Here, mother's section 388 petition was made on the eve of the section 366.26 hearing. At that point, the children's interest in stability was the court's foremost concern and outweighed any interest in reunification. The prospect of an additional six months of reunification to see if mother would and could do what was required to regain custody would not have promoted stability for the children, and thus would not have promoted their best interests. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.)

In *Angel B.*, the facts presented by the section 388 petition showed that the mother was "doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with Angel." (*Angel B.*, *supra*, 97 Cal.App.4th at pp. 464-465.) The *Angel B.* court also assumed, for the sake of this appeal, that the mother's resolve was different, and that she would be able to remain sober, remain employed, become self-supporting and obtain housing. Even so, the *Angel B.* court found that such facts were not legally sufficient to require a hearing on her

22

section 388 petition.  (*Angel B.,* at pp. 464-465.)  The *Angel B.* court reasoned that "there is a rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers.  [Citation.]  To rebut that presumption, a parent must make some factual showing that the best interests of the child would be served by modification."  (*Id.* at p. 465.)

Here, as in *Angel B.*, mother did not make such a showing.  She did not present any evidence that returning the children to mother or delaying adoption by providing mother with additional reunification services was in the children's best interests.  We therefore conclude the juvenile court did not abuse its discretion in summarily denying mother's section 388 petition on the grounds mother had not made a prima facie showing of changed circumstances or that granting her section 388 petition was in the children's best interests.

## IV

## BENEFICIAL PARENT RELATIONSHIP EXCEPTION

Father contends the juvenile court abused its discretion by rejecting the beneficial parent relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i).  Father argues the juvenile court failed to consider that terminating his parental rights, with a plan of adoption, allowed for the possibility the children, as a sibling group, would be separated from each other.  Father asserts this possibility of separation of the sibling group provides a compelling reason against terminating his parental rights.

23

*A. Applicable Law*

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *Marina S.*, at p. 164.)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parent relationship exception may apply when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) The parent has the burden of showing either that "(1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)

No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The relationship that gives rise

24

to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) To overcome the preference for adoption, the parent must show that severing the parent-child relationship "would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621.) The juvenile court may consider the relationship between a parent and a child in the context of a dependency setting, but the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155-1156; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

B. *Standard of Review*

California courts have disagreed as to the applicable standard of review for an

appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. We agree with the view expressed in *In re K.P.*, "that review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review." The substantial evidence standard of review applies to the factual determination of whether a beneficial parental or sibling relationship exists. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) The abuse of discretion standard of review applies when determining whether the existence of that relationship "constitutes 'a compelling reason for determining that termination would be detrimental to the child.'" (*Id.* at p. 622.)

*C. Discussion*

Father has not demonstrated that his relationship with the children is so significant that its termination would greatly harm the children, or that his relationship outweighs the well-being the children would gain in a permanent, stable adoptive home with AuJ and her husband. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) The children should not be deprived of living in a permanent, stable home through adoption by their prospective adoptive parents, when father has not met the needs of the children and has not maintained a parental role in their lives or established the ability to provide them with a stable home environment.

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. [Citation.] While the exact nature of the

26

kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, "the relationship must be such that the child would suffer detriment from its termination." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 467, fn. omitted.)

Although the evidence indicated that father acted lovingly and appropriately with the children during most visits, he failed to demonstrate that the children's relationship with him was so significant that its termination would cause the children significant detriment. Father's visits throughout the juvenile dependency proceedings were brief and closely supervised, with no progress in liberalizing the duration, frequency, or supervision. Initially, his supervised visits were once a week, for two hours a visit. In June 2014, the court ordered parents to visit separately and in July 2014, the court suspended mother's visits with A.K. because A.K. had exhibited severe adverse behaviors after visiting with mother. Father's visits were reduced in December 2014 to twice a month, for two hours a visit. During a visit in November 2014, father had become upset at A.J.J. and resorted to hitting him in the month at the end of a visit.

In addition, A.J. had been removed from parents twice; the first time for three years when she was between the ages of six and nine, and again in the instant case, after returning to parents and living with them for about six months. Also, within the past year, parents continued to have relationship problems with each other, creating a greater likelihood of instability if the children were returned to parents.

On the other hand, at the time of the section 366.26 hearing, the children had been living with their prospective adoptive parents for a year and a half and were happy living

27

with them.  The children were together, they had bonded with AuJ and her family, and A.J. and A.J.J. had expressed the desire or willingness to be adopted.  Although A.K. was too young to express his desires, he was part of the sibling group father had told the social worker he wanted kept together.

The totality of evidence supported the juvenile court's finding that there would be no significant detriment in terminating father's parental rights.  At the time of the section 366.26 hearing, father did not hold a parental role or have a substantial, positive emotional attachment such that the children would be greatly harmed by termination of his parental rights.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)  Furthermore, AuJ and her husband were willing to allow the children to maintain a relationship with the parents.

Father argues that, although he is not asserting the beneficial sibling relationship exception to adoption applies, termination of his parental rights would be detrimental to the children because there would be the possibility the children might be separated from each other during the adoption process.  This possibility is founded on pure speculation, without any supporting evidence.  The three children were placed as a sibling group with father's adult daughter, AuJ, and her husband.  The children's three-month-old brother was also placed with AuJ and her husband.  When in May 2014 the social worker discussed with father recommending adoption for the children, father told the social worker he did not care if AuJ adopted the children or had guardianship of them, as long as the children stayed together.

Since almost the inception of the juvenile dependency proceedings, the children have lived with AuJ and her husband, who are willing to adopt the children.  There is no

evidence that the children would not be adopted as a sibling group by AuJ or that they will at some point be separated. In the absence of any evidence supporting such a speculative outcome, the mere possibility the sibling group might be separated if parental rights are terminated, is not a legally valid basis for applying the beneficial parent relationship exception.

Although after termination of their reunification services, parents attempted to overcome factors leading to the removal of the children and visited the children relatively consistently throughout the proceedings, the juvenile court did not abuse its discretion in rejecting the beneficial parent relationship exception. The juvenile court reasonably concluded that parents' relationship with the children did not outweigh the benefits of adoption of the children by AuJ and her husband, who had provided the children with a stable and loving home for over a year and a half, and were willing to adopt the children.

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON     <br>J.

We concur:


RAMIREZ     
     P. J.


MILLER     
     J.

29